Orlando V. BROWN, Plaintiff,

v.

SPRINGFIELD CITY SCHOOLS BOARD OF EDUCATION, Defendant.

No. C–3–86–198.

United States District Court, S.D. Ohio, W.D., at Dayton.

May 27, 1988.

---

**11.** See the Court's previous discussion of Black Clawson's respondeat superior liability.

Jeffrey M. Silverstein, Dayton, Ohio, for plaintiff.

William R. Groves, Leslie L. Stobbs, Martin, Browne, Hull & Harper, Springfield, Ohio, for defendant.

## DECISION AND ENTRY ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE; PLAINTIFF'S COMPLAINT DISMISSED WITH PREJUDICE; TERMINATION ENTRY

HERMAN J. WEBER, District Judge.

The Court has reviewed the Report and Recommendation of the United States Magistrate, to whom the captioned cause was referred for trial on the remaining Title VII claim pursuant to 42 U.S.C. § 2000e–5(f)(5) and noting that no objections have been filed thereto, concurs with and hereby adopts the findings, conclusions and recommendation contained therein that the Plaintiff's Complaint should be dismissed with prejudice.

This Court, accordingly, orders that the Plaintiff's complaint herein shall be dismissed with prejudice and that judgment shall be entered in favor of the Defendant and against the Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

## REPORT AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE

MICHAEL R. MERZ, United States Magistrate.

Plaintiff filed this action May 12, 1986, claiming age and race discrimination in his removal as principal at the Franklin Middle School in Springfield, Ohio, and in the Defendant's subsequent failure to hire him for either of two elementary principalships in 1985. On August 5, 1987, the Magistrate recommended that the age discrimination claims be dismissed because Plaintiff was unable to prove a prima facie case and that the race discrimination claims related to the removal at Franklin Middle School be dismissed as barred by the statute of limitations (Doc. # 21). These recommendations were accepted (Doc. # 26) and the case was referred to the Magistrate for trial on the remaining Title VII claim pursuant to 42 U.S.C. § 2000e–5(f)(5).

The case came on for trial on April 11, 1988. At the conclusion of Plaintiff's evidence on April 13, 1988, the Defendant moved for dismissal pursuant to Fed.R.Civ. P. 41(b). The motion was granted after argument.

The Court's function on such a motion is not to determine if a plaintiff has produced a prima facie case. Rather, the Court is to weigh the facts, make determinations of credibility, resolve conflicts in the evidence, and decide whether at that point the plain-

tiff has proven his case by a preponderance of the evidence. *Bach v. Friden Calculating Machine Co.*, 148 F.2d 407 (6th Cir. 1945); 9 Wright and Miller, *Federal Practice and Procedure, § 2371.*

In ruling upon a motion under Fed.R.Civ. P. 41(b), the Court is required to make findings of fact and conclusions of law. The following opinion contains the Magistrate's proposed findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

Plaintiff Orlando V. Brown is a black male citizen of the United States and a resident of the Village of Yellow Springs in Greene County, Ohio. After successful service as an officer in the Army artillery, he applied for a job at NCR in Dayton in the early 1950's. Having been notified of his acceptance, he was then refused employment on the explicit ground of his race. He thereupon decided to change fields and acquired a bachelor's degree in education from Central State University in 1967. After several years teaching and administrative internship in the Dayton school system, he accepted a position as principal of the Hayward Junior High School in Springfield in 1970. By the end of academic year 1972–73, he would have been entitled to a continuing teacher contract. However, the Springfield Education Association filed a grievance against him for sexual harassment which involved kissing several teachers. He was reprimanded for his conduct, five teachers were transferred from the school, and he was given another one-year contract (Defendant's Exhibits [hereinafter "DX"] C, R, and S). He believed that the entire incident was the result of a white conspiracy against him, orchestrated by one of his assistant principals.

In 1977, apparently in compliance with an agreement with the U.S. Department of Health, Education, and Welfare, Springfield entered into a staff and student desegregation plan. Pursuant to that plan, all junior high principals were transferred to new buildings. Mr. Brown went from Hayward to Franklin and took with him his assistant principal, Ms. Rose Workman. Franklin had been a predominantly white school in a lower income community. After the desegregation plan was put in place, it was approximately 25% black Mr. Brown's first year there.

According to former superintendent Thomas Payton, a continuing concern of the administration with Mr. Brown was the high rate of teacher turnover at schools where he was principal, reflecting teacher morale problems. Hayward had had a low turnover rate before he was principal there, and it went up and remained high while he was principal, declining again after he left. Staff problems began to surface very soon after his arrival at Franklin, and by December, 1977, he had written to the administration to request the transfer of five teachers (DXDD). He had quarreled with one of the teachers, Mrs. Jaeckels, about sign-in sheets (DXEE, DXFF). He had accused one of the teachers, Mr. Mowery, of racism, a charge which resulted in another SEA grievance and an apology by Brown to Mowery.

By February of 1978, the problem had become so serious that he asked Mr. Dale and Mr. Naille to come into the school to investigate. They interviewed virtually the entire staff and produced a lengthy report to Mr. Brown (DXE). The staff felt there were serious problems with discipline in the school, a conclusion the interview team shared after observations. The staff also felt that Mr. Brown interpreted things in racial terms far too often (DXE, p. 5). The interview team made suggestions for change and improvement of discipline was included as a major goal for Mr. Brown's evaluation for the next school year (DXZ).

Most of the controversy between the parties revolves around events of the 1983–84 school year. Mr. Brown was still principal at Franklin and Ms. Workman his sole assistant principal, to whom he had delegated most discipline problems.

During the year, many discipline problems were encountered with student Brent Besecker. In response, his parents were many times in Mr. Brown's office complaining loudly and, according to Mr. Brown, using racial epithets on at least one occasion. Several times Mr. Besecker voiced

his complaints over the telephone to Mrs. Barbara Crabill, then president of the Defendant Board. Mrs. Crabill testified that she handled the complaints as she always did: she referred the Beseckers to the appropriate administrator (in this case, Ken Dale, director of student services), and then reported the complaint both to Mr. Dale and to Mr. Payton, the superintendent. In at least one case, the Beseckers appealed to Mr. Dale from Mr. Brown's decision on a suspension and it was overturned for lack of student due process. Nonetheless, the Beseckers remained quite unhappy with the administration at Franklin School, particularly its handling of discipline.

A serious incident occurred February 24, 1984, when a white, eighth-grade student, Amy Huff, was beaten by a black student, Venitha Wilson. Miss Wilson alleged Miss Huff precipitated the incident by calling her a "black bitch." The beating occurred outside the school immediately after school hours and Miss Huff was unable to take refuge in the school because the doors were locked. When she eventually got back in, Mrs. Workman treated her with ice but did not call the police or emergency squad. Eventually Mrs. Workman suspended Miss Wilson for three days for the beating (DXHH), but Miss Huff's parents were very angry at the way the matter was handled (DXII).

The Beseckers, Huffs, and other parents with concerns about Franklin's administration petitioned to meet with the Board of Education (DXG), and were allowed to do so on March 13, 1984. Because the complaints were of a personnel nature, the Board heard them in executive session. Mr. Brown did not know the parents were meeting with the Board that night and made no request to attend the executive session. All of the complaining parents were white.

The next day Messrs. Dale and Payton spent about two hours with Mr. Brown explaining the parents' complaints and asking him for a detailed response. His first response was on March 20, 1984 (DXL) in which he claimed "... the vast majority of these allegations are untruths, fueled with vitriolic racism, masked behind economic hard times and encouraged by a weak administration." He asserted the administrators could have ended the whole episode by telling the parents they had complete confidence in Mr. Brown and Mrs. Workman (DXL). He then demanded the right to confront his accusers "eyeball to eyeball."

In response to Mr. Brown's request the administration arranged two four-hour meetings with the parents on April 9 and 16, 1984. The attending parents were basically the same people who had attended on March 13, 1984, and were all white. No minutes have been made of the meetings, but all parties agree that essentially the same complaints as had been made on March 13 were discussed.

In the meantime on April 4, 1984, Plaintiff responded further in writing to the parents' concerns (DXGG). Because this letter does not relate to specific incident complaints and no minutes were kept of the March 13, 1984, meeting, the Court has some difficulty understanding all of Mr. Brown's references in the letter; many of them were not testified about. The administrators advised Mr. Brown the responses were not detailed and documented enough; they requested logs from the Isolated Learning Center, rosters and minutes from Parent Advisory Council meetings, and other supporting documentation.

One of the complaints made by one or more parents was about the "overdoing" of Black History Month (February). Whether this was a valid pedagogical concern by the parent or, conversely, reflected racial prejudice, the Court is unable to determine. However, Mr. Payton testified without contradiction that Black History Month is an encouraged part of the official curriculum. There is no indication the administration in any way considered Mr. Brown's handling of Black History Month to be inappropriate.

Some parents also complained about a field trip to Central State University, a black institution, undertaken by the eighth grade team. Objection to this event may well have reflected racial prejudice by the

objecting parent(s), since the event in question was a motivation/skills seminar conducted at Central State by a white female faculty person from the University of Dayton. However, there is no indication the Springfield administration criticized Mr. Brown for this event.

However, once the administration began investigating the parent complaints, it found a number of things to criticize, many of which had been problems with Mr. Brown's performance earlier in his career.

With respect to discipline, the administration found a serious problem with use of the Isolated Learning Center. The ILC is supposed to serve as an in-school suspension facility. Under Board regulations (DXQQ), assignment to ILC can only be made by the principal with prompt notice to parents. Although these regulations are quite explicit, Mr. Brown was also using the ILC for a different purpose: teachers who felt particular students needed "time out" from regular class participation could send students directly to the ILC without principal approval and without notification of parents. Whether this would be a wise idea in the abstract is not for the Court to decide; it clearly violated explicit Board policy.

In the ordinary course of things, Ken Dale and James Slusher had conducted an annual evaluation of Mr. Brown. The results were furnished to him on January 11, 1984 (DXF). While the evaluation was "positive" and the administration intended to continue Mr. Brown's administrative contract for the following year, it expressed serious concern over staff morale, particularly since there had been two staff requests to transfer (*Id.*). Mr. Brown was upset with the evaluation. He claimed "... it is extremely unfair, very prejudiced, specifically designed and worded to be damaging and totally unfounded." He demanded to meet with the Board and was permitted to do so in executive session on March 13, 1984. There was no testimony about the contents of this meeting.

While investigating parent complaints, the administrators also revisited Mr. Brown's evaluation for the current academic year.

The administrators found that Franklin's Parent Advisory Council, the intended primary channel for parent concerns, had not been active. While Mr. Brown claimed it was meeting monthly, he was unable to produce rosters or minutes for such meetings.

The administrators also talked with staff members at Franklin and found many of the same dissatisfactions as had existed previously. Later during the same period they found Mr. Brown evaluated teachers at Franklin using exactly the same language for each teacher (DXAAA).

In addition to the problems which existed, the administrators were most concerned with Mr. Brown's utter denial that there were any problems.

At the end of the 1983–84 school year, Mr. Brown and Mrs. Workman (a white female) were removed as administrators at Franklin. Mr. Brown was reassigned as a "caretaker" administrator at Elmwood School for one year and then re-assigned to classroom duties as the ILC teacher at Clarke Middle School, where he remains.

In 1985 Mr. Brown applied for the principalship openings at Lagonda and Simon Kenton Elementary Schools. Thirty-eight persons in all applied for the two positions. Four of the applicants were former Springfield administrators, black and white, whose administrative contracts had been non-renewed. These applicants were not interviewed because they had been terminated for poor performance. The two successful candidates were both white males, but no other information about their qualifications has been presented to the Court. It is admitted that Mr. Brown possessed the minimum paper qualifications for the position of elementary principal, although he had never served in that capacity.

Mr. Brown's own racial attitudes make his opinions on the subject highly suspect. Virtually every time he has received professional criticism, he has claimed it was motivated by white racial prejudice. Yet he himself is quite willing to engage in racial invective and to insist on racial sol-

idarity from black policy makers. Defendant Board was unanimous in upholding his removal from Franklin and the non-renewal of his administrative contract. After that happened, he threatened (DXTT) the one black Board member, Reverend Robert Dye; if Dye did not support his position, he said, "... as a strong AME layman, I am going to personally have a talk with Bishop Hilderbrand to terminate your services with the church connection or put you in a very small church where you cannot destroy the lives of merging [sic] black people ..." He defined the term "handkerchief head blacks" as referring to black people who were disloyal to other blacks, like house slaves during slavery who informed to whites on field slaves. Then in a subsequent letter he called Dye a "hankerchief [sic] head son of a bitch" and accused him of selling out black people in the Springfield City Schools (DXSS).

 Plaintiff's case meets the minimum requirements for a prima facie case of discrimination in hiring: he applied for the two vacant principalships, he met the minimum qualifications, he was not hired, and white persons were hired for each of the jobs. *McDonnel–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, the Board articulated a legitimate non-discriminatory reason for not hiring him: he had previously been removed from an administrative position for deficiencies in performance over an extended period of time. Plaintiff failed to prove this was pretext for racial discrimination: his deficiencies over time were well-documented and other white former administrators were also not considered for the two vacant principalships. Furthermore, when the Board removed Mr. Brown from Franklin, they treated Mrs. Workman, his white female assistant principal, in exactly the same fashion. While there is some evidence that some of the complaining white parents were at least in part racially prejudiced, there is no evidence the Board or administration shared those prejudices or acted on them or even knew of some of the manifestations (i.e. shouted racial epithets) of which Mr. Brown complains.

The burden of proof in a racial discrimination case remains on the Plaintiff throughout. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiff has not met his burden of proving that racial discrimination was in any way a significant factor in the Defendant's failure to rehire him as a principal in 1985.

The Complaint should be dismissed with prejudice.